IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2025 Term

No. 23-717

**FILED**

**November 7, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

RONALD HARDY, RALPH MANUEL, EDGEL DUDLESON, RICKY MILLER,
JAMES CRUEY, MARK SCOTT, and GARY SCOTT,
Plaintiffs Below, Petitioners,

v.

3M COMPANY, MINE SAFETY APPLIANCES COMPANY, LLC, AMERICAN
OPTICAL CORPORATION, CABOT CSC CORPORATION, CABOT
CORPORATION, EASTERN STATE MINE SUPPLY COMPANY, and RALEIGH
MINE AND INDUSTRIAL SUPPLY,
Defendants Below, Respondents.

Appeal from the Intermediate Court of Appeals of West Virginia
No. 22-ICA-123
Civil Action Nos. 21-C-41, 21-C-42, 21-C-43,
21-C-44, 21-C-48, 21-C-51, and 21-C-52

AFFIRMED

Submitted: September 23, 2025
Filed: November 7, 2025

Samuel B. Petsonk, Esq.
Petsonk Law
Beckley, West Virginia

Lonnie C. Simmons, Esq.
Robert M. Bastress III, Esq.
DiPiero, Simmons,
McGinley & Bastress PLLC
Charleston, West Virginia

Bryant J. Spann, Esq.
Robert H. Akers, Esq.
Thomas Combs & Spann PLLC
Charleston, West Virginia
Attorneys for Respondent 3M

Benjamin L. Bailey, Esq.
Eric B. Snyder, Esq.
Nicholas S. Johnson, Esq.
John A. Budig, Esq.

Bren J. Pomponio, Esq.
Mountain State Justice, Inc.
Charleston, West Virginia

Attorneys for Petitioners

Joshua I. Hammack, Esq., *Pro Hac Vice*
Bailey & Glasser, LLP
Charleston, West Virginia
Attorneys for Respondent Mine Safety
Appliances Company, LLC

Marc E. Williams, Esq.
Thomas M. Hancock, Esq.
Kendra L. Huff, Esq.
Alexander C. Frampton, Esq.
Allyssa A. Kimbler, Esq.
Nelson Mullins Riley & Scarborough LLP
Huntington, West Virginia
Attorneys for Respondents American
Optical Corporation, Cabot CSC
Corporation, and Cabot Corporation

JUSTICE BUNN delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.    "On appeal of a decision from the Intermediate Court of Appeals of West Virginia, the Supreme Court of Appeals of West Virginia applies a de novo standard of appellate review to a circuit court's entry of summary judgment." Syllabus Point 1, *Moorhead v. W. Va. Army Nat'l Guard*, 251 W. Va. 600, 915 S.E.2d 378 (2025).

2.    "A five-step analysis should be applied to determine whether a cause of action is time-barred. First, the court should identify the applicable statute of limitation for each cause of action. Second, the court (or, if questions of material fact exist, the jury) should identify when the requisite elements of the cause of action occurred. Third, the discovery rule should be applied to determine when the statute of limitation began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action, as set forth in Syllabus Point 4 of *Gaither v. City Hosp., Inc.*, 199 W. Va. 706, 487 S.E.2d 901 (1997). Fourth, if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled. And fifth, the court or the jury should determine if the statute of limitation period was arrested by some other tolling doctrine. Only the first step is purely a question of law; the resolution of steps two through

five will generally involve questions of material fact that will need to be resolved by the trier of fact." Syllabus Point 5, *Dunn v. Rockwell*, 225 W. Va. 43, 689 S.E.2d 255 (2009).

3.      "In products liability cases, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence should know, (1) that he has been injured, (2) the identity of the maker of the product, and (3) that the product had a causal relation to his injury." Syllabus Point 1, *Hickman v. Grover*, 178 W. Va. 249, 358 S.E.2d 810 (1987).

4.      "In tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury. Syllabus Point 4, *Gaither v. City Hosp., Inc.*, 199 W. Va. 706, 487 S.E.2d 901 (1997).

5.      "Under the discovery rule set forth in Syllabus Point 4 of *Gaither v. City Hosp.*, Inc., 199 W. Va. 706, 487 S.E.2d 901 (1997), whether a plaintiff 'knows of' or 'discovered' a cause of action is an objective test. The plaintiff is charged with knowledge of the factual, rather than the legal, basis for the action. This objective test focuses upon whether a reasonable prudent person would have known, or by the exercise of reasonable

ii

diligence should have known, of the elements of a possible cause of action." Syllabus Point 4, *Dunn v. Rockwell*, 225 W. Va. 43, 689 S.E.2d 255 (2009).

6.      "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Cas. and Sur. Co. v. Fed. Ins. Co. of N.Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

7.      "The circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syllabus Point 3, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

8.      "Roughly stated, a 'genuine issue' for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed 'material' facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law." Syllabus Point 5, *Jividen v. Law*, 194 W. Va. 705, 461 S.E.2d 451 (1995).

**BUNN, Justice:**

Petitioners Ronald Hardy, Ralph Manuel, Edgel Dudleson, Ricky Miller, James Cruey, Mark Scott, and Gary Scott (collectively, "Petitioners") appeal the decision of the Intermediate Court of Appeals of West Virginia that affirmed the Circuit Court of McDowell County's order granting summary judgment in favor of Respondent manufacturers/distributors on the basis that Petitioners' products liability claims for defective respirators resulting in occupational lung diseases had not been filed within two years of the accrual of their claims. On appeal to this Court, Petitioners contend that the ICA and the circuit court improperly resolved issues of disputed fact relative to when the statute of limitations began to run by erroneously applying a traumatic injury standard to determine the accrual date rather than one that appropriately captures the discovery rule's tolling mechanisms in latent disease cases. Petitioners further argue that the ICA endorsed the circuit court's improper resolution of factual disputes surrounding Respondents' alleged fraudulent concealment of the cause of action. Upon review, we find no error in the circuit court and ICA's determinations that summary judgment was appropriate under the facts of these cases, which present no trialworthy issue as to the statute of limitations.

# I.

## FACTUAL AND PROCEDURAL HISTORY

Petitioners brought products liability suits against the manufacturers and distributors of respirators that Petitioners used during their employment as coal miners

1

which they contend failed to prevent dust-related lung injuries.[1] Although Petitioners filed individual complaints against the Respondent manufacturers/distributors that supplied their specific respirators, the circuit court consolidated the seven cases for purposes of discovery. Respondents each filed motions for summary judgment, contending that all Petitioners had failed to file their claims within the applicable two-year statute of limitations. The circuit court analyzed each Petitioner's injury to determine when he "objectively and reasonably [knew] that something was wrong," utilizing one of the following predetermined "triggering" dates: (1) the date a Petitioner was awarded more than five percent *de minimis* disability compensation for a work-related, dust-based chronic lung injury; (2) the date a Petitioner was medically diagnosed with any form of lung impairment resulting from their

---

[1] Petitioners Ronald Hardy, Ralph Manuel, Ricky Miller, James Cruey, and Gary Scott filed suit against 3M. Ralph Manuel, Edgel Dudleson, James Cruey, Mark Scott, and Gary Scott filed suit against MSA. Edgel Dudleson and Gary Scott filed suit against AO-C.

Petitioners Edgel Dudleson and Gary Scott additionally filed suit against Aearo LLC and Aearo Technologies (Aearo entities) as a related entity to AO-C, referred to by the circuit court and filings collectively below as "AO-C-A." In its brief, AO-C contends that the Aearo entities were granted summary judgment, despite the existence of a bankruptcy stay applicable to them and which resulted in their non-participation in the the ICA case. However, under *Rebuild America, Inc. v. Davis*, 235 W. Va. 245, 773 S.E.2d 11 (2015), and *Cottrell v. Cottrell*, No. 20-0761, 2023 WL 3168317 (W. Va. May 1, 2023) (memorandum decision), a summary judgment order that purports to extend to co-defendants protected by the automatic stay provisions of 11 U.S.C. § 362 is void ab initio. In fact, the circuit court filings reflect AO-C's concession that "[p]ursuant to federal law, an automatic bankruptcy stay applies to [the Aearo entities.] Therefore, this [summary judgment reply brief] is being filed only on behalf of [AO-C]. However, Defendants kept the naming convention 'AO-C-A' to avoid any confusion." The circuit court's summary judgment order further reflects that the Aearo entities are entitled to an automatic stay under federal law. We thus conclude that the summary judgment order does not extend to the Aearo entities.

inhalation of coal, rock, and sand dust; or (3) the date a Petitioner applied for federal black lung benefits. Applying one of those triggering events to each Petitioner's claim, the circuit court determined that Petitioners each sustained their injuries more than two years prior to the filing of the complaint, that they knew that inhalation of dust could cause those types of lung injuries, that respirators were intended to stymie that inhalation, and that each Petitioner knew who manufactured their respirators. Accordingly, the circuit court entered summary judgment in favor of Respondents.

Petitioners appealed to the ICA, and those appeals were likewise consolidated for decision.[2] There, Petitioners argued that the circuit court had answered jury questions in determining when each plaintiff knew or should have known of the elements of a possible cause of action. Along those lines, Petitioners claimed that because their lung injuries developed over time, a reasonable jury could have concluded that they did not become aware of their injuries until a later date when they had become more severe and "sufficiently pronounced."

The ICA affirmed, concluding that the circuit court appropriately entered summary judgment after finding that there were no genuine issues of material fact with respect to the statute of limitations in each case. Petitioners appeal from that decision.

---

[2] *Hardy v. 3M Co.*, No. 22-ICA-123, 2023 WL 7402890 (W. Va. Ct. App. Nov. 8, 2023) (memorandum decision).

3

## II.

## STANDARD OF REVIEW

Rule 56 of the West Virginia Rules of Civil Procedure provides, in relevant part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3]

In the absence of a material factual dispute, the movant is entitled to summary judgment as a matter of law. *Moorhead v. W. Va. Army Nat'l Guard*, 251 W. Va. 600, __, 915 S.E.2d 378, 383 (2025). Accordingly, our review is plenary: "On appeal of a decision from the Intermediate Court of Appeals of West Virginia, the Supreme Court of Appeals of West Virginia applies a de novo standard of appellate review to a circuit court's entry of summary judgment." Syl. Pt. 1, *id*. We thus apply the same standard as a circuit court in determining whether there is a genuine issue of material fact for trial. *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 58, 459 S.E.2d 329, 335 (1995).

---

[3] Rule 56 of the West Virginia Rules of Civil Procedure was amended effective January 1, 2025. Because the circuit court applied the pre-amendment version of the rule, we quote that language here. However, the portions of Rule 56(c) relevant to this appeal have only been stylistically modified and are now contained at subsection (a), providing that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Thus, the standard for entry of summary judgment in the absence of a genuine issue of material fact cited and analyzed herein has not been substantively altered.

## III.

## DISCUSSION

Petitioners argue that the ICA erred in calculating the running of the statute of limitations in these cases by (1) erroneously applying a traumatic injury standard of reasonable knowledge to these pure latent injury cases; (2) improperly crafting a bright-line rule for when the statute of limitations commences based on three dates certain in products liability cases based on defective respirators; and (3) resolving disputed facts in the case of each Petitioner.[4] In affirming the entry of summary judgment, we first address the discovery rule in the context of products liability actions and conclude that the lower courts did not apply an erroneous standard. However, as explained below, we conclude that the circuit court and ICA erred in assigning three dates certain when any one Petitioner's claim accrued. And, to the extent the ICA's decision established a bright-line rule for accrual dates for all similarly situated plaintiffs, it erred in so doing: statute of limitations and discovery rule analyses are case-specific inquiries.

Conscious of that case-specific inquiry, we next clarify that statute of limitations analyses involving application of the discovery rule are not immunized from summary judgment, nor are cases involving latent injuries peculiarly within the sole province of a jury's determination. Next, under our de novo review of Petitioners' arguments we find that there were no genuine issues of disputed fact as applied to each

_____

[4] Petitioners refer to these dates as "magic moment" accrual dates.

5

Petitioner's individual case and conclude that summary judgment was appropriate because each Petitioner knew or reasonably should have known that (1) he had been injured and (2) there was a causal relationship between his injury and his respirator more than two years before filing his complaint. Finally, contrary to Petitioners' argument, we conclude that there is no evidence of fraudulent concealment that would toll the running of the statute of limitations in these cases.

## A. Timeliness of Petitioners' Claims Under *Dunn*

Statutes of limitation serve important purposes: "to encourage promptness in instituting actions; to suppress stale demands or fraudulent claims; and to avoid inconvenience which may result from delay in asserting rights or claims when it is practicable to assert them." *Morgan v. Grace Hosp., Inc.*, 149 W. Va. 783, 791, 144 S.E.2d 156, 161 (1965). *Dunn* provides a comprehensive statute of limitations analysis that governs our broader view of the timeliness of Petitioners' claims:

> A five-step analysis should be applied to determine whether a cause of action is time-barred. First, the court should identify the applicable statute of limitation for each cause of action. Second, the court (or, if questions of material fact exist, the jury) should identify when the requisite elements of the cause of action occurred. Third, the discovery rule should be applied to determine when the statute of limitation began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action, as set forth in Syllabus Point 4 of *Gaither v. City Hosp., Inc.*, 199 W. Va. 706, 487 S.E.2d 901 (1997). Fourth, if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a

6

plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled. And fifth, the court or the jury should determine if the statute of limitation period was arrested by some other tolling doctrine. Only the first step is purely a question of law; the resolution of steps two through five will generally involve questions of material fact that will need to be resolved by the trier of fact.

Syl. Pt. 5, *Dunn*, 225 W. Va. 43, 689 S.E.2d 255.

Before applying these factors, we pause to frame our analysis. There is no dispute here that a two-year statute of limitations applies to each Petitioner's cause of action under West Virginia Code § 55-2-12.[5] Likewise, Petitioners argue only that the discovery rule should apply to toll accrual of their claims for lack of knowledge of their injury and its cause, and that Respondents fraudulently concealed their cause of action, so we focus our analysis on factors two, three, and four of the *Dunn* framework, beginning with the observation that, in this particular context, the second and third factors require the same

---

[5] West Virginia Code § 55-2-12 provides:

Every personal action for which no limitation is otherwise prescribed shall be brought: (a) Within two years next after the right to bring the same shall have accrued, if it be for damage to property; (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries; and (c) within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.

7

analysis.

### i. The Discovery Rule's Application in Products Liability Actions

The second *Dunn* factor assigns an occurrence date to the elements of a cause

of action to determine when it accrued, while the third factor asks whether the discovery

rule, discussed below, should apply to toll the cause of action's accrual for lack of

knowledge establishing the factual basis of claim. *See* Syl. Pt. 5, *Dunn*. The parties do not

dispute the overarching criteria required to find that each Petitioner's claim has accrued for

purposes of triggering the statute of limitations:

> [i]n products liability cases, the statute of limitations begins to
> run when the plaintiff knows, or by the exercise of reasonable
> diligence should know, (1) that he has been injured, (2) the
> identity of the maker of the product, and (3) that the product
> had a causal relation to his injury.

Syl. Pt. 1, *Hickman v. Grover*, 178 W. Va. 249, 358 S.E.2d 810 (1987). In the products

liability context, the discovery rule is incorporated into *Hickman*'s accrual criteria,[6] so the

---

[6] Since 1920, in *Petrelli v. West Virginia-Pittsburgh Coal Co.*, 86 W. Va. 607, 104 S.E. 103 (1920), the Court had, on a case-by-case basis, extended the discovery rule to certain types of actions consistent with scenarios that met the underlying purpose of the discovery rule, and *Hickman* was one such early extension of the discovery rule into products liability. *Hickman*'s syllabus point thus incorporates the discovery rule into the products liability sphere, and, in doing so, merged the elements of the cause of action with the discovery rule to create a new accrual rule for those types of cases. The three-part accrual criteria in *Hickman*'s syllabus was the Court's answer to a certified question asking whether the discovery rule may be applied in products liability cases. *Hickman*, 178 W. Va. at 251-52, 358 S.E.2d 812-13. In crafting that syllabus point, the Court noted that "[b]efore today, the statute of limitations for products liability actions was said to have run from the date of injury[,]" going on to trace recognition of the discovery rule in medical malpractice cases, and the "hint" in *Jones v. Tr. of Bethany College*, 177 W. Va. 168, 351 S.E.2d 183

8

second and third *Dunn* factors are considered together as set forth in *Hickman* and refined

through the discovery rule pronounced in *Gaither*, discussed below.

Recognizing that when rigidly applied the statute of limitations could result

in inequities, the discovery rule evolved as an equitable doctrine applied, where

appropriate, to soften its sharp edges by tolling accrual of a claim until such time as a

plaintiff is aware or should be aware that it exists. *Gaither*, 199 W. Va. at 711-12, 487

S.E.2d at 906-07; *Hickman*, 178 W. Va. at 251, 358 S.E.2d at 812 ("From an administrative

view, [running the statute of limitations from the time of injury] created a very neat,

workable test. However, it also produced several harsh results."). The discovery rule thus

"has its origins in the fact that many times an injured party is unable to know of the

existence of an injury or its cause." *Gaither*, 199 W. Va. at 713, 487 S.E.2d at 908. We have

thus explained that "[g]enerally, the statute of limitations begins to run when a tort occurs;

however, under the 'discovery rule,' the statute of limitations is tolled until a claimant

knows or by reasonable diligence should know of his claim." *Id.* at 711, 487 S.E.2d at 906.

The Court in *Gaither* summarized the discovery rule as follows:

> In tort actions, unless there is a clear statutory
> prohibition to its application, under the discovery rule the
> statute of limitations begins to run when the plaintiff knows, or
> by the exercise of reasonable diligence, should know (1) that

---

(1986), that the Court might be persuaded, as other courts had been, to extend it to products liability. *Id.* Case-by-case extension was later abandoned in favor of permitting general application of the discovery rule unless prohibited by statute. *See Gaither*, 199 W. Va. at 712, 487 S.E.2d at 907 (citing Syl. Pt. 2, *Cart v. Magnum*, 188 W. Va. 241, 423 S.E.2d 644 (1992) (overruled on other grounds by *Dunn*, 225 W. Va. at 51-52, 689 S.E.2d at 263-64)).

the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.

Syl. Pt. 4, *id.*

Regarding the determination of when a plaintiff obtained the requisite knowledge to know they may have a cause of action, this Court has explained that "[i]n most cases, the typical plaintiff will 'discover' the existence of a cause of action, and the statute of limitation will begin to run, at the same time that the actionable conduct occurs." *Dunn*, 225 W. Va. at 53, 689 S.E.2d at 265. But where that does not occur, when a plaintiff "discovers" his or her cause of action is determined by an objective test, focusing on when a reasonable, prudent person knew the *factual* basis for their claim:

> Under the discovery rule set forth in Syllabus Point 4 of *Gaither v. City Hosp., Inc.*, 199 W. Va. 706, 487 S.E.2d 901 (1997), whether a plaintiff "knows of" or "discovered" a cause of action is an objective test. The plaintiff is charged with knowledge of the factual, rather than the legal, basis for the action. This objective test focuses upon whether a reasonable prudent person would have known, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action.

Syl. Pt. 4, *Dunn*, 255 W. Va. at 53, 689 S.E.2d at 265.

Applying *Hickman*, *Gaither*, and *Dunn*, the operative analysis is when each Petitioner had the factual basis to know, or by objective standards, *should* have known that (1) that he had been injured; (2) that there was a causal connection between his injury and a product; and (3) the identity of the maker of the product. Together, that factual foundation

10

triggers the statute of limitations in each Petitioner's case. Because it is undisputed here that each Petitioner knew the identity of the maker of the respirators he wore, we shift our focus to (1) knowledge of an injury and (2) knowledge of a causal connection between his lung injuries and the respirators.

In evaluating these criteria, Petitioners argue that the lower courts did not appreciate the distinctions between the latent injuries at issue in the underlying cases and traumatic injuries when applying the discovery rule, and, in so doing, applied the wrong standard and resolved matters that should have been decided by a jury. We disagree and reiterate that whether a traumatic or latent injury, an injury has occurred for purposes of the statute of limitations when a plaintiff knows or should know that he or she has sustained some actionable harm.

### ii. Knowledge of a Latent Injury

Each Petitioner suffers from injuries falling within a spectrum of dust-related lung diseases that is broadly and colloquially known as "black lung." *See, e.g.*, *Adams v. Am. Optical Corp.*, 979 F.3d 248, 252 (4th Cir. 2020) (referencing the National Institute of Safety and Health (NIOSH) description of coal workers' pneumoconiosis, known colloquially as black lung, as a latent occupational disease marked by fibrosis or scarring of the lungs caused by inhalation of dust). Petitioners' expert's explanation, as referenced in the circuit court's order, described their injuries as follows: "Coal mine dust lung disease is a spectrum of lung disease that includes not only coal workers' pneumoconiosis, mixed-

11

dust pneumoconiosis, and silicosis, but also obstructive lung disease such as chronic obstructive pulmonary disease, as well as pulmonary fibrosis known as dust-related diffuse fibrosis." It is undisputed that each Petitioner's injury was latent in nature, insofar as it was the result of continuous exposure to dust during their mining employment and developed slowly over time.[7] What is disputed is when an injury of this type is said to have occurred under *Hickman* for purposes of a statute of limitations analysis.

Petitioners advocate that because their latent injuries are obscured from discovery,[8] they should not be charged with knowledge of their injury until it becomes

---

[7] *Bethany College* distinguishes three categories of injury: a traumatic injury, a traumatic event/latent manifestation, and a pure latent injury. 177 W. Va. at 170-71, 351 S.E.2d at 185-86. In a traumatic injury case, one suffers a noticeable, immediate injury; in a traumatic event/latent manifestation case, one suffers a noticeable, immediate injury, but later discovers a latent injury arising from the same traumatic event; and in a pure latent injury case, there is no single, traumatic event that would serve to put the plaintiff on notice, and so the plaintiff "fails to discover either the injury or its cause until long after the negligent act occurred." *Id.* (quoting *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 230 (5th Cir. 1984)). A latent injury, then, is one that develops over time or otherwise does not manifest at the same time as an observable harm or event. *See, e.g.*, *Bethany College*, 177 W. Va. at 170, 351 S.E.2d at 185 ("The common denominator in [products liability] cases is that the product often causes an injury only after a lengthy period of exposure or the injury surfaces only after a considerable period of time from the date of exposure.").

[8] Products liability cases were among the first to apply the discovery rule because they are one of a few prototypical examples of circumstances where "pure latent injuries" arise:

> "The pure latent injury case ordinarily arises in one of three situations: a suit by a worker who contracts an occupational disease, a medical malpractice suit by a patient who discovers an injury long after the negligent medical treatment has been administered, or a product liability suit by a consumer of a drug or other medically related product who discovers a side effect

12

"sufficiently pronounced," which they contend involves more concrete knowledge than the standard used in traumatic injury cases, that is, that a plaintiff knew "something was wrong." Respondents counter that whether a latent or traumatic injury is "sufficiently pronounced" or a plaintiff knew "something was wrong" are distinctions without a difference. We agree that Petitioners' argument presents a difference in semantics, not substance.

We dismiss at the outset the notion that "sufficiently pronounced" is an existing "standard" consistently applied in latent injury cases.[9] Nowhere in *Bethany College* is the phrase "sufficiently pronounced" articulated as a standard of injury assessment nor is it *applied* to determine when a latent injury is said to occur for purposes of claim accrual.[10] Petitioners do not point us to any cases that apply it as a separately

> from the use of the defendant's product. In each of the pure latent injury cases, the plaintiff fails to discover either the injury or its cause until long after the negligent act occurred."

*Bethany College* 177 W. Va. at 170-71, 351 S.E.2d at 185-86 (quoting *Albertson*, 749 F.2d at 230. *See also Albertson*, 749 F.2d at 230 ("The discovery rule was initially articulated and has had its greatest acceptance in the occupational disease case.").

[9] Petitioners' "sufficiently pronounced" language comes from *Bethany College*, where this Court acknowledged in dicta that *other* courts were applying the discovery rule in certain products liability cases, stating, "[b]ecause the injury initially is not *sufficiently pronounced* to put a plaintiff on notice that he has been injured, courts conclude the statute of limitations does not begin to run until the plaintiff is aware of the injury or through reasonable diligence should have been aware of the injury." *Id.* at 170, 351 S.E.2d at 185 (emphasis added).

[10] *Bethany College* contains no analysis on pure latent injuries because it did not *involve* pure latent injuries. Its discussion is limited to the acknowledgment that other

13

established standard of injury assessment that the lower courts simply ignored. Contrary to Petitioners' argument, *Goodwin v. Bayer Corp.*, a latent disease case decided nearly two decades after *Bethany College* and after the formal adoption of the discovery rule into the products liability sphere in *Hickman*, did not apply a "sufficiently pronounced" standard. 218 W. Va. 215, 624 S.E.2d 562 (2005). Rather, *Bayer* discussed that an injury culminates when a plaintiff "has knowledge of the fact that something is wrong and not when he or she knows of the *particular nature* of the injury." *Id.* at 221, 624 S.E.2d at 568 (emphasis in original). Acknowledging that *Bayer* is not on all fours with the cases before us,[11] we nonetheless conclude that *Bayer*'s pronouncements are applicable here but, more pointedly, we discern no meaningful distinction between its "something wrong" language and the point at which an injury becomes "sufficiently pronounced."

Contrary to Petitioners' contentions, "something was wrong" or "sufficiently pronounced" are not rigid, differing standards against which to judge a plaintiff's

---

courts had extended the discovery rule to products liability cases. Rather, it dealt with a traumatic event/latent manifestation case and held that the statute began to run as of the time of the traumatic event regardless of whether the plaintiff knew of the full extent of his injuries. *Id.* at 171-72, 351 S.E.2d at 186-87.

[11] Petitioners argue that any standard developed in *Bayer* cannot be used here in the latent injury context because *Bayer* was not a pure latent injury case and loses its relevance for that fact. *Bayer*, however, involved *both* a latent injury and a traumatic event/latent manifestation injury where the plaintiff suffered lung injuries from years of paint exposure accompanied by a single, injurious exposure years later. Because we conclude that neither *Bethany College* nor *Bayer* purports to set a rigid standard of when an injury is said to occur, we need not examine the extent to which the facts of *Bayer* support either party's arguments.

knowledge of his or her injury; they are simply different ways to express the well-established, objective standard that triggers the statute of limitations. When an injury becomes sufficiently pronounced to place a plaintiff on notice of the fact of an injury means the same thing as when a plaintiff knows there is something wrong—both contemplate that a plaintiff has "discovered" their injury, or, by objective standards *should* have discovered it, and triggers a duty to investigate the injury and its cause. *See McCoy v. Miller*, 213 W. Va. 161, 165, 578 S.E.2d 355, 359 (2003). Put differently, an injury is an injury and the only question under the discovery rule is when a plaintiff knows it exists; latent injuries simply manifest at a later date.[12] Petitioners provide no authority to support their underlying proposition that a plaintiff with a latent injury must obtain *more* knowledge of his or her injury than a plaintiff with a traumatic injury before the statute of limitations is triggered. Instead, we find the difference is in timing: the point at which a latent injury is no longer obscured from the plaintiff's discovery. Latent injury cases merely call for courts or juries to conduct a more sophisticated analysis than the straightforward one conducted for traumatic injuries.

---

[12] In *Westfield Ins. Co. v. Sistersville Tank Works, Inc.*, 249 W. Va. 287, 895 S.E.2d 142 (2023), this Court recently answered a certified question hinging on the point in time that a bodily injury occurs in chemical exposure latent injury cases so as to trigger occurrence-based insurance coverage. While we are not oblivious to the overlap, the difference in contexts is too stark to be meaningfully relevant. Any analysis of when an "injury" is said to have occurred for a plaintiff suffering from a latent disease cannot purport to bridge both contexts lest it interfere with other considerations consonant with the discovery rule and insurance contract interpretation.

### iii.    Knowledge of a Causal Connection

In addition to knowledge of the injury itself, the statute of limitations in products liability actions is only triggered when the factual circumstances also provide an objective basis for knowledge of the possibility of a causal connection between the product and the injury. Importantly, like all elements of their cause of action, plaintiffs are charged with knowledge of the *factual* basis to make a causal connection, not the legal one: "whether a plaintiff 'knows of' or 'discovered' a cause of action is an objective test. The plaintiff is charged with knowledge of the factual, rather than the legal, basis for the action." Syl. Pt. 4, in part, *Dunn*, 225 W. Va. 53, 689 S.E.2d 265. *See also Teets v. Mine Safety Appliances Co., LLC*, No. 21-1834, 2022 WL 14365086 at *2 (4th Cir. October 25, 2022); *Merrill v. W. Va. Dep't. of Health and Hum. Res.*, 219 W. Va. 151, 158, 632 S.E.2d 307, 314 (quoting *Moreland v. Aetna U.S. Healthcare Inc.*, 831 A.2d 1091, 1096 (Md. 2003) ("The discovery rule, in other words, applies to discovery of facts, not to discovery of law[.]")); *U.S. v. Kubrick*, 444 U.S. 111, 112 (1979) (holding that under the Federal Tort Claims Act "[a] plaintiff . . . armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purposes of the limitations statute.").

Specific to products liability, this Court has explicitly rejected any requirement that a plaintiff must know that the product itself is defective, only that a product bears some causal connection to the injury. *Hickman*, 178 W. Va. at 253, 358 S.E.2d

16

at 814. Like knowledge of an injury, causal connection is also judged from actual or objective knowledge that a certain product could have caused or, in this case, failed to prevent the injury. *See id.* at Syl. Pt. 1 ("In products liability cases, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence should know . . . that the product had a causal relation to his injury."); Syl. Pt. 4, in part, *Dunn*, 225 W. Va. at 53, 689 S.E.2d at 265. Consistent with *Hickman*'s reasonably diligent plaintiff standard, plaintiffs have an affirmative duty to investigate an injury and its potential causes: "[w]here a plaintiff knows of his injury, and the facts surrounding that injury place him on notice of the possible breach of a duty of care, that plaintiff has an affirmative duty to further and fully investigate the facts surrounding that potential breach." *McCoy*, 213 W. Va. at 165, 578 S.E.2d at 360 (citing *Harrison v. Davis,* 197 W. Va. 651, 478 S.E.2d 104 (1996)). Stated another way, the discovery rule is not intended to reward the dilatory plaintiff or sanction willful ignorance of a cause of action.

Having outlined the standards against which Petitioners' claims are judged for timeliness, we turn to Petitioners' argument that a jury, and not a court, should make that accrual determination and that summary judgment was inappropriate.

### B. *Propriety of Summary Judgment Based on the Statute of Limitations*

Petitioners' cases are postured from the grant of summary judgment, pursuant to Rule 56 of the West Virginia Rules of Civil Procedure, which standards are now well-established through case law application. "A motion for summary judgment should be

17

granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. and Sur. Co. v. Fed. Ins. Co. of N.Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963). It is likewise well settled that summary disposition is not intended as a substitute for the jury's fact-finding role. Rather, "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syl. Pt. 3, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

We have explained that while the court must draw all permissible inferences from the underlying facts in the light most favorable to the nonmoving party, the party opposing summary judgment must offer more than a mere "scintilla of evidence" sufficient for a reasonable jury to find in the nonmoving party's favor. *Id.* at 192-93, 451 S.E.2d at 758-59. That is, the party opposing the motion must offer some "'concrete evidence from which a reasonable finder of fact could return a verdict in its favor' or other 'significant probative evidence tending to support the complaint.'" *Id.* at 193, 451 S.E.2d at 759 (citation modified) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

Accordingly, a party may avoid summary disposition with evidence of a "genuine issue of material fact," which includes two distinct elements of a factual dispute that must both be present to make an issue trialworthy. The factual issue must be *genuinely* in dispute and it must be material to the outcome:

18

Roughly stated, a "genuine issue" for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed "material" facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law.

Syl. Pt. 5, *Jividen v. Law*, 194 W. Va. 705, 461 S.E.2d 451 (1995). This Court has further cautioned that "genuineness and materiality are not infinitely elastic euphemisms that may be stretched to fit whatever preferrations [sic] catch a litigant's fancy." *Powderidge Unit Owners Ass'n v. Highland Props., Ltd.*, 196 W. Va. 692, 698, 474 S.E.2d 872, 878 (1996). Rather, "[a] 'dispute about a material fact is "genuine" . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 248.

Of the two, only genuineness is at issue in a summary judgment analysis involving the statute of limitations and application of the discovery rule. Carrying the weight of foreclosing the claim entirely, statutes of limitation are material by nature. But before analyzing whether the circuit court, as affirmed by the ICA, appropriately determined that there was no genuine issue of disputed fact, we pause to address Petitioners' insistence that statutes of limitation and application of the discovery rule are somehow insulated from summary disposition.

### i. The Discovery Rule Does Not Alter the Standards of Rule 56 of the West Virginia Rules of Civil Procedure

Underscoring all of Petitioners' assignments of error is the premise that, generally, cases involving the statute of limitations and the discovery rule's application thereto are necessarily jury questions not amenable to summary judgment. And, more specifically, their argument that cases involving latent injuries are *especially* insulated from summary judgment. Petitioners advocate that, due to the nature of the claims and injuries, a court should, by default, submit the question of the discovery rule's application to the jury. Contrary to Petitioners' position, this Court has on many occasions affirmed the entry of summary judgment based on a statute of limitations defense where, based on the evidence, no reasonable juror could conclude that the claim had been filed within the applicable time frame. *See, e.g.*, *Sager v. Duvert*, 249 W. Va. 221, 895 S.E.2d 76 (2023); *Coffield v. Robinson*, 245 W. Va. 55, 857 S.E.2d 395 (2021); *Jones v. Aburahma*, 215 W. Va. 521, 600 S.E.2d 233 (2004); *Thompson v. Branches-Domestic Violence Shelter of Huntington, W. Va. Inc.*, 207 W. Va. 479, 524 S.E.2d 33 (2000); *Vorholt v. One Valley Bank*, 201 W. Va. 480, 498 S.E.2d 241 (1997).[13]

---

[13] The Court rejected a similar argument asserting that statutes of limitation were only capable of jury resolution in *Bayer*, finding that "summary judgment can and should be granted on the basis of an applicable statute of limitations when no genuine issue of material fact exists as to whether the statute of limitations has been violated." 218 W. Va. at 220, 624 S.E.2d at 567. Applying the summary judgment standard, the Court determined that the lack of disputed facts surrounding the statute of limitations transformed a typically factual inquiry into a legal one: "Here, the material facts are not in general dispute. Thus,

Likewise, application of the discovery rule—while fact-intensive—does not necessarily preclude summary judgment or usurp the role of the jury. In support, Petitioners rely on Syllabus point 5 of *Dunn*, 225 W. Va. 43, 689 S.E.2d 255, and Syllabus point 8 of *State ex rel. 3M Co. v. Hoke*, 244 W. Va. 299, 852 S.E.2d 799 (2020), both of which state a "general rule" that when the statute of limitations began to run is a jury question. Neither, however, may be read to override the standards set forth in Rule 56 to immunize certain types of cases from summary disposition.

*Dunn*, set forth above, provides a broadly applicable test to determine whether a cause of action is time-barred, inclusive of the now well-developed "discovery rule." It states, in pertinent part, that four steps of the five are generally more suitable for jury resolution: "[o]nly the first step is purely a question of law; the resolution of steps two through five will generally involve questions of material fact that will need to be resolved by the trier of fact." Syl. Pt. 5, in part, *Dunn*, 225 W. Va. 43, 689 S.E.2d 255. *Hoke* similarly states that statutes of limitation and the discovery rule are typically questions for a jury, albeit in an altogether different context and posture. Syl. Pt. 8, *Hoke*, 244 W. Va. 299, 852 S.E.2d 799 (determining the time the Attorney General discovers or reasonably should have discovered the deception, fraud, or other unlawful conduct supporting the action is

---

where, as here, the issue is one of law, a consideration of summary judgment is appropriate." *Id.*

21

"generally a question of fact").[14]

Review of these cases demonstrates that, while *Dunn* and *Hoke* emphasize the fact-intensive inquiry involved in application of the discovery rule, they merely articulate a *general* rule that issues involving statutes of limitation and the discovery rule do not pose strictly legal questions and may be susceptible to disputed facts. Petitioners cite no cases purporting to support application of the "general rule" beyond those bounds, and scrutinizing a claim for issues of disputed fact is the very nature of any summary judgment analysis. Indeed, this Court has never applied this "general rule" as an additional hurdle the movant must overcome in seeking summary judgment under Rule 56, nor has that general rule been recognized as a standalone defense to summary judgment in lieu of producing evidence of trialworthy issues.[15]

---

[14] *Hoke* was decided from the posture of a petition for a writ of prohibition where this Court agreed with the circuit court that summary judgment was premature where the discovery rule's application "depend[ed] on the facts that, as of yet, ha[d] not been explored by the parties in discovery[,]" and concluded that the parties should be permitted to develop their evidence and present it anew in competing motions for summary judgment. *Id.* at 310, 852 S.E.2d at 810.

[15] The sentences immediately following *Dunn*'s five-step syllabus point underscore the point made here by acknowledging that there must be a genuine dispute of material fact for a jury to consider:

> [T]he depth to which these five steps are analyzed is naturally dependent upon the procedural posture and facts of the case under review. And to reiterate: only the first step is a question of law for resolution by the trial court. The remaining steps generally involve mixed questions of law and fact, and a trial court is required to analyze mixed questions of law and fact . .

More specific to the latent injuries at issue in the underlying cases, Petitioners submit that the complexity of the inquiry, both legally and medically speaking, requires that a jury decide it. Petitioners' point, as we take it, is that whatever the discovery date may be is much more capable of calculation by a *court* when it is accompanied by a triggering, traumatic event. But where, as in latent disease cases, symptoms develop slowly over time, determining that date becomes much more susceptible to a genuine factual dispute as to when a plaintiff is on notice that their symptoms have developed to such point that they provide notice and awareness of an actionable injury. We do not disagree with the premise of Petitioners' argument. We merely observe that these are not cases where vague and ambiguous symptoms lie to one side of the statute of limitations and diagnosis lies to the other, such that a reasonable jury could find the claim timely if it accepted some version of events where the symptoms themselves were insufficient to put the plaintiff on notice of an injury; these cases do not involve injuries that were "totally undetectable" and "non-injurious" until after the statute of limitations had run.

---

. in order to determine "whether there is . . . [a] genuine issue of fact to be tried and inquiry concerning the facts is . . . desirable to clarify the application of the law." Syllabus Point 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of N.Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963). When the resolution of a step requires resolution of a genuine issue of material fact, the issue should be submitted to the finder of fact.

*Dunn*, 225 W. Va. at 53, 689 S.E.2d at 265.

We thus reject the invitation to submit Petitioners' claims to the jury by operation of a bright-line rule that latent disease cases always present genuine disputes of fact relative to application of the discovery rule. Just as we soundly rejected the notion that discovery rule cases are *always* jury issues, here too we decline to insulate latent injury cases from summary disposition and emphasize that a general rule is just that. As observed above, latent disease cases simply require more sophisticated analysis of the discovery rule, but just because the task is formidable does not mean it *must* be put to the jury:

> [w]hile the application of law to facts may be complicated or even difficult at times, this is not a bar to a summary judgment. "Resolution of the legal issues is for the court, and will not be rendered easier by going through the futile motions of a trial when there is no issue of fact to be tried."

*Johnson v. Farmers & Merchants Bank*, 180 W. Va. 702, 713, 379 S.E.2d 752, 763 (1989) (quoting J. Moore, *Federal Practice* § 56.16 (1988)). We have further explained that

> [w]hile many cases will require a jury to resolve the issue of when a plaintiff discovered his or her injury, including the related issue of whether the plaintiff was reasonably diligent in discovery of his or her injury, the issue can also be resolved by the court where the relevant facts are undisputed and only one conclusion may be drawn from those facts.

*Legg v. Rashid*, 222 W. Va. 169, 176, 663 S.E.2d 623, 630 (2008).

Where the facts are beyond the dispute of reasonable jurors, courts need not strain reasonability past its breaking point to avoid entry of summary judgment merely because the claim arises in the latent injury context. Rule 56 of the West Virginia Rules of Civil Procedure makes no such exception to summary judgment, and we do not create one

here. The recognition that certain types of issues are more likely to require jury resolution does not alter the summary judgment standard: "Rule 56 was incorporated into West Virginia civil practice for good reason, and circuit courts should not hesitate to summarily dispose of litigation where the requirements of the Rule are satisfied." *Jividen*, 194 W. Va. at 713, 461 S.E.2d at 459.

## C. *Petitioners' Claims are Untimely Under a Discovery Rule Analysis*

Having concluded that we assess claims under the discovery rule based on the circumstances of each case to determine whether there is a genuine issue for trial, we proceed to consider each Petitioner's claim under Syllabus point 1 of *Hickman*, which bears repeating:

> In products liability cases, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence should know, (1) that he has been injured, (2) the identity of the maker of the product, and (3) that the product had a causal relation to his injury.

178 W. Va. 249, 358 S.E.2d 810. In each of these cases, it is undisputed that each individual Petitioner knew the identity of the maker of the product, so our analysis focuses on the first and third elements of *Hickman*.

Because all reasonable inferences are drawn in favor of the nonmoving party, we do not purport to set a finite date at which the statute of limitations began to run, but ask merely whether each plaintiff had knowledge of an "injury," as explained above, *and* knew or should have known of a possible causal connection between that injury and the

25

respirator at some point more than two years before filing suit.

### i. Predetermined Accrual Dates are Inconsistent with the Discovery Rule's Circumstance-driven Analysis

In answering these two questions, the circuit court and the ICA embraced an overarching accrual rule that there are three so-dubbed "magic moments" at which an injury occurs in a latent injury case involving pneumoconiosis. Specifically, the circuit court concluded that Petitioners' claims accrued at the earliest of any one of the following trigger dates: (1) the date that a plaintiff was awarded more than five percent *de minimis* disability compensation for work-related, dust-based chronic lung injury; (2) the date that a plaintiff was medically diagnosed with any form of lung impairment resulting from his inhalation of coal, rock, and sand dust; or (3) the date that a plaintiff applied for federal black lung benefits.[16]

Each of these fixed dates, reasoned the circuit court, would be indicative that a Petitioner knew or should have known that he had suffered an injury for purposes of a discovery rule analysis. To the first, a plaintiff is charged with knowledge because he was

---

[16] Under the Federal Coal Mine Health and Safety Act of 1969, as amended (Black Lung Benefits Act ("BLBA")), a claimant may receive federal benefits if it is determined that he suffers from either clinical or legal pneumoconiosis and he is totally disabled as a result. The terms clinical and legal pneumoconiosis are defined by federal regulations, and a finding of total disability is based on federal regulatory standards. BLBA claims are resolved before the United States Office of Workers' Compensation Programs ("OWCP") and typically involve medical examinations and may involve sworn testimony relative to disability.

told by an administrative body that he had a work-related lung injury from inhaling dust, by which he was sufficiently impaired to receive disability compensation for it. To the second, a plaintiff is charged with knowledge because they were told by a physician that they had suffered a lung injury from inhalation of dust. And third, a plaintiff is charged with knowledge when applying for federal black lung benefits, because an applicant is required to explain how he believes he is disabled from his work in mines and to certify that all responses are true to the best of their knowledge and belief. Moreover, benefits are not available unless a miner is totally disabled from black lung as defined and evaluated under federal regulations.

While these three proposed accrual dates are not irrelevant to the analysis, they must be viewed in an overall context rather than blindly applied as a cutoff date. Certainly, then, Petitioners are correct that imposing a universally applicable rule for claim accrual is inconsistent with the often fact-intensive inquiry attendant to a summary judgment analysis in general, and summary judgment analysis of the statute of limitations, in particular. From our review of the circuit court's order, however, it appears that consolidation gave rise to these three "magic moment" accrual dates as an organizational method to address Petitioners' claims. The circuit court nevertheless conducted the requisite case-by-case analysis with attention devoted to the facts as they pertained to each Petitioner, so while we find error in the stated method, we find none in the conclusion that

summary judgment was appropriate in these cases.[17]

Whilst arguing against the circuit court's bright-line accrual date rule as violative of the principles underlying the discovery rule, Petitioners advocate for one of their own: that due to the nature of pneumoconiosis, injuries are not significant enough to put a plaintiff on notice of a potential claim until he is diagnosed with a *severe* form of black lung disease and their statute of limitations should be tolled until such time as he is made aware of that diagnosis. Petitioners contend that a reasonable person would not have known that he was suffering from an "inherently undetectable" ailment until suffering an "appreciable loss of function" or some "measurable impairment." Petitioners go further to state that the most pertinent date for a jury's consideration would be an *award* of federal black lung benefits.

But Petitioners' argument warps the operative, objective standard of when a plaintiff knows or should know that he has suffered an injury, and we have already rejected the premise that a standard of when an injury is "sufficiently pronounced" is transmuted into a different, heightened standard of knowledge. Consistent with that conclusion, we likewise disagree that an injury cannot be appreciated by a reasonable plaintiff—even with

---

[17] To the extent the ICA decision may be read to endorse application of those three accrual dates as a "rule" to be applied in future cases, we emphasize that consolidation does not obviate the need for case-by-case evaluation of the factual knowledge attributable to each individual plaintiff to determine the accrual date of a claim. In all cases, summary judgment is improper where disputed facts surrounding those accrual dates could lead the trier of fact to reasonably conclude that the statute of limitations had not expired.

a medical diagnosis of the injury—absent some accompanying, substantial impairment. Reminiscent of, and indeed even citing to, workers' compensation and federal black lung benefit definitions and standards, Petitioners would equate "sufficiently pronounced" to *uncontroverted* diagnosis plus impairment.[18] West Virginia tort law currently imposes no such requirement, and we find no support to impose it here.

The administrative proceedings for state or federal black lung benefits are relevant only insofar as they may tend to demonstrate that a plaintiff was on notice that he had sustained a lung injury. Federal and state benefits are awarded based on entirely different standards of proof that have nothing to do with the fact of an injury but rather its genesis and degree of severity. Federal black lung benefits in particular are riddled with presumptions based on the length of time spent working in coal mines and base a finding of total disability on federal regulatory standards.[19] There is simply no basis to conclude

---

[18] That is not to say that state workers' compensation law or federal black lung benefits are wholly irrelevant to analysis of when a plaintiff with pneumoconiosis may be on notice of an injury. We do not discount that impairment, under certain circumstances, may equate to knowledge of an injury, but find its use in discussing the appropriate *standard* unnecessarily complicates an "injury" in the *tort* context. We examine workers' compensation and federal black lung benefits to the extent relevant in each individual Petitioner's case.

[19] *See, e.g.*, 20 C.F.R. § 718.201 (defining clinical and legal pneumoconiosis for purposes of BLBA); 20 C.F.R. § 718.204 (establishing criteria for total disability as including presumption-based disability under 20 C.F.R. § 718.304 and evaluation-based disability under federal standards set forth in pulmonary function tables); 20 C.F.R. § 718.305 (establishing presumptions of pneumoconiosis evaluation based on length of coal mine work history and dust exposure).

that an injury in tort is not appreciated—an inquiry that assesses the facts known to a plaintiff—until an administrative body says that a plaintiff has fully litigated and met a largely unrelated *legal* burden of proof sufficient to award benefits in a separate proceeding.

Unencumbered by either party's proposed bright-line accrual dates, we analyze each case under *Hickman* to ascertain when each Petitioner knew or by objective standards should have known that he was injured and that his respirator may be causally connected to that injury insofar as it failed to protect him from it. Mindful that Petitioners' cases must be analyzed individually and not categorically, we nevertheless observe that these cases were consolidated because they present common issues and legal arguments that rise and fall on the same basis.

### ii.  Ronald Hardy

Petitioner Ronald Hardy filed his complaint against Respondents on August 18, 2021. We ask, then, whether at any point prior to August 18, 2019, Mr. Hardy knew or should have known he was injured and knew or should have known of the possibility of a causal connection between his injury and a respirator since it is undisputed that Mr. Hardy was aware at all relevant times that 3M manufactured the respirators he wore.

Mr. Hardy worked as a coal miner from 1968 until 2001 and began noticing he had breathing issues while working at Island Creek Coal between 1995 and 2001. At his

deposition in the underlying case, Mr. Hardy testified that he wore respirators for dust protection, believing that it would prevent him from getting sick and that it would prevent him from breathing in dust.[20] He further testified that he wore his respirator because the mines were dusty, he had seen his father suffer from black lung, and he wanted to avoid it. Still, he testified that he wore respirators "a little less" than fifty percent of the time because he only wore a respirator when actually cutting coal and loading shuttle cars, later clarifying he wore a respirator about forty percent of the time.

Mr. Hardy applied for federal black lung benefits on June 4, 2018, and during that administrative process was examined by several physicians and participated in depositions. On July 31, 2018, Mr. Hardy was examined by Dr. Forehand, who diagnosed him with "obstructive lung disease with impairment of gas exchange." Mr. Hardy testified via deposition taken on November 12, 2018 during his federal black lung benefit proceedings that Dr. Forehand informed him earlier that year that he had black lung. During that 2018 deposition, Mr. Hardy was specifically asked if he had filed a lawsuit related to his respirator.

Following Dr. Forehand's evaluation and diagnosis, Mr. Hardy's x-rays were

---

[20] In his testimony, Mr. Hardy expressed that he knew he should not be breathing in dust but also made some confusing and conflicting statements about silica dust versus coal dust in relation to black lung, none of which affect our analysis.

evaluated by various B-readers[21] who gave conflicting medical opinions as to whether he suffered from black lung. Mr. Hardy testified that he began receiving black lung benefit checks in October of 2019, despite those conflicting reports, and further testified that he knew he had black lung when he began receiving the benefits checks. Mr. Hardy consulted counsel regarding a potential products liability action on July 2, 2021 and, as noted above, the complaint in this case followed shortly thereafter, but his federal benefit proceedings remained ongoing even at that point. Mr. Hardy finally received an award of black lung benefits on September 29, 2022.

From these facts, Mr. Hardy asks this Court to conclude that a reasonable jury could find that he did not know of both his injury and its causal connection to a respirator until either (1) he met with counsel on July 2, 2021, at which time he was advised that he may have a claim against 3M relative to the respirators or (2) September 29, 2022, when his federal black lung benefits were awarded and he became sure he suffered from black lung. Mr. Hardy disagrees with the circuit court and ICA's use of Dr. Forehand's diagnosis as the *latest* date by which his claim accrued due to the conflicting medical opinions that followed the initial diagnosis and his failure to appreciate the causal connection between a respirator and black lung until his counsel specifically informed him

---

[21] B-readers are physicians who have passed a test showing they can accurately classify chest radiographs with pneumoconiosis, as opposed to A-readers who have merely taken the course on how to recognize and classify pneumoconiosis on chest radiographs. *See* 42 C.F.R. § 37.52 (establishing system for classifying pneumoconiosis)

32

of it.

We reject Mr. Hardy's contention that a reasonable jury could conclude, under West Virginia law, that he knew neither that he had sustained an injury nor knew of its cause until he was awarded black lung benefits on September 29, 2022. That conclusion is reinforced by the conundrum it presents: his complaint filed in August 2021 brought claims that he now asserts he was unaware of the existence of until more than a year after filing suit.

Although we reject the conclusion that Mr. Hardy's federal black lung proceedings triggered the statute of limitations, Mr. Hardy relies upon the conflicting diagnoses in those proceedings as belying his presumed knowledge of his injury and its causation. But his position is neither legally nor practically tenable. Mr. Hardy testified in November 2018 that he had been diagnosed with black lung earlier that year.[22] That other medical experts disagreed about to the existence or severity of Mr. Hardy's lung issues does not negate the notice that, according to a medical expert, he had an injury. From a practical perspective, it is unworkable that an injury does not accrue until such time as some arbitrary number of confirming diagnoses are obtained. Differing expert opinions are

---

[22] To this, Mr. Hardy emphasizes that although Dr. Forehand told him he had all the qualifications for black lung in 2018, he only "knew" in October or November of 2019 when he got a medical card and a check. For reasons explained here, we reject the position that a claimant has no injury or knowledge of its cause until he begins receiving administrative benefits.

33

a hallmark of litigation, and if claims are said to avoid staleness until all medical experts agree, they would never accrue at all.

Having determined that Mr. Hardy was aware of his injury, at the latest, by the time he was diagnosed with black lung by Dr. Forehand in July 2018, we turn to Mr. Hardy's awareness of a causal connection between black lung and his respirator.

We first reject the argument that Mr. Hardy did not know of a possible causal connection between black lung and the respirators until his attorney specifically advised him of it. The Fourth Circuit recently rejected this line of reasoning in a factually analogous scenario in *Teets* as "creat[ing] an exception large enough to swallow the rule." 2022 WL 14365086 at *2. The court explained that

> allowing [the plaintiff] to claim ignorance until he was told of a potential cause of action by an attorney . . . "could vitiate the statute of limitations by allowing a plaintiff to plead a stale case merely because he did not see 'the right lawyer' at the appropriate time." *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 641 (6th Cir. 1986). Permitting stale claims to circumvent the statute of limitations undermines the requirement of "reasonable diligence" to discover and bring suits within a given time. *Dunn*, 689 S.E.2d at 262.

*Id.* We agree with the Fourth Circuit's analysis that accrual tied to legal notice of a claim is inconsistent with the reasonable diligence requirement, and, as stated above, a plaintiff is charged with the factual, not legal, basis of his claim.

Mr. Hardy next argues that he made no subjective connection between his

34

respirator use and his black lung diagnosis, content to rest on the notion that he just simply did not think about it. He contends that a reasonable jury might conclude that he assumed he contracted black lung from the times when he did not use his respirator, or, in other words, that the fault was no one else's but his own. However, Mr. Hardy's position in this respect asks us to examine whether he personally made a connection between his respirator and his development of black lung, when the operative question is not only whether he *did* make the connection, but whether he *should have*. It also ignores that where the circumstances surrounding the injury would tend to indicate one or more possible causes, a plaintiff has a duty to investigate the facts surrounding his or her injury and all potential causes. *See McCoy*, 213 W. Va. at 165, 578 S.E.2d at 360. That Mr. Hardy's sporadic respirator use might have contributed to his black lung does not displace the respirator's ineffectiveness as another potential cause where, as here, the undisputed facts are that he wore his respirator specifically to avoid the dust exposure that he knew might cause black lung. The fact of an injury and the circumstances surrounding the injury put a plaintiff on notice that there might be a possible breach, and under *McCoy*, a plaintiff has a duty to investigate it.

Mr. Hardy's circumstances are not novel. In fact, this Court affirmed the entry of summary judgment in *Collins v. Mine Safety Appliances, Co.*, on the basis that it was undisputed that the plaintiff there knew that coal mine dust could cause black lung, the identity of the respirator he "wore continuously" throughout his career, and therefore knew or should have known of the causal connection between the respirator and his injury. No.

35

21-0621, 2022 WL 10084174 at *2-3 (W. Va. Oct. 17, 2022) (memorandum decision). *Teets*, decided by the Fourth Circuit applying West Virginia law, similarly found that the plaintiff knew as of his 2017 diagnosis "that he had been injured, that the inhalation of coal dust caused [coal workers' pneumoconiosis], that he always wore respirators made by [the defendants], and that the respirators would prevent [coal workers' pneumoconiosis] if they worked properly." 2022 WL 14365086 at *2. The Fourth Circuit thus concluded the plaintiff knew or should have known of the elements of a possible cause of action as of that date. *Id.*

Mr. Hardy argues that *Collins* and *Teets* have no relevance to the causal analyses to be conducted in the underlying cases because the plaintiffs in those cases purported to use their respirators at all times, where he did not. We observe that the circumstances giving rise to the duty to investigate were the same there as they are here: a coal miner who wore a respirator to prevent a dust-based disease and then contracted the very disease he wore a respirator to prevent. That Mr. Hardy did not wear his respirators one hundred percent of the time does not obviate the need for investigation of a potential breach, particularly where there is a finite amount of potential contributing causes to his injury. *See*, *e.g.*, *Boggs v. 3M Co.*, No. 11-57-ART, 2012 WL 3644967 at *3 (E.D. Ky. Aug. 24, 2012) (finding that knowledge of dust-based illness and using respirators to prevent that illness led to "natural conclusion [] that the respirators may not have worked as intended" and "[o]ther courts have held that the statute-of-limitations clock starts when plaintiffs have even fewer facts tying their disease to its cause." (collecting cases)). The

36

duty to investigate possible sources of a breach contains no requirement that a plaintiff discover that his respirator was the sole and exclusive cause of his dust-based lung disease before he is on notice that there is a potential causal connection between them. Indeed, the presence of joint tortfeasors or comparative negligence cannot endlessly confound the running of the statute of limitations.

Like the plaintiffs in *Collins* and in *Teets*, the factual circumstances and nature of the harm itself readily demonstrate that Mr. Hardy was armed with all of the critical facts for any reasonable plaintiff to have made a causal connection between his black lung diagnosis and his respirator for purposes of claim accrual. Mr. Hardy testified that his father had black lung as a result of his mining career, and for that reason, he wore his respirator in the dustier parts of the mine to protect himself from dust inhalation. Mr. Hardy further testified that he thought the respirators had protected him and was surprised when he found out he had black lung. Mr. Hardy was even asked during his November 2018 deposition whether he had considered suing respirator manufacturers. But even if we accepted Mr. Hardy's contention that he *subjectively* did not appreciate a causal connection until that time, the November 2018 date is still insufficient to save the staleness of his claim.

A reasonably diligent plaintiff in Mr. Hardy's position would be aware that he had an injury, at the latest, as of the time of diagnosis in July 2018. Similarly, a reasonably diligent plaintiff would have drawn the natural conclusion that, or at minimum

37

investigated whether, the respirator he wore to protect himself from that particular injury might have failed to protect him from it. We thus conclude that the undisputed facts show, as a matter of law, that Mr. Hardy knew, or reasonably should have known, all relevant facts necessary to pursue his products liability claim against 3M more than two years before it was filed, even with benefit of the discovery rule.

### iii.    Ralph Manuel

Mr. Manuel filed his complaint on August 19, 2021, so to determine whether the circuit court erred in granting summary judgment, we ask whether he knew of both his injury and its possible causal connection to his respirator more than two years prior to that date. Mr. Manuel worked as a coal miner from 1978[23] to 2021. From around 1982 to 1990 and 1998 to 2013, Mr. Manuel wore respirators manufactured by Respondent MSA, and from 2013 to 2019 wore respirators manufactured by Respondent 3M.[24] He was aware during those time frames who had manufactured the respirators he wore.

At his deposition, Mr. Manuel testified that not long after he began working

---

[23] Portions of the record indicate his mining career began in 1981, but this date is not relevant for purposes of our analysis.

[24] We note Mr. Manuel's claims against each respondent may have accrued at different times. Mr. Manuel's claim against 3M cannot be said to have accrued before he began wearing 3M masks in 2013; therefore, we begin our analysis from the end of his work history by which point he had used both 3M and MSA masks. We approach these analyses utilizing the latest possible date that the statute of limitations might have been triggered to give each plaintiff the benefit of every doubt in a summary judgment analysis, and, specific to Mr. Manuel, to span his use of both 3M and MSA respirators.

38

in the mines, he came to understand that coal dust caused black lung, and that his father-in-law and two brothers-in-law as well as friends and coworkers had died from it. He also testified that he wore a respirator to protect himself from coal dust and black lung, and that he expected that those respirators were protecting him from dust, but did not always wear it depending on his work location within the mine. He first filed for state workers' compensation benefits in 1999, during which a physician diagnosed him with silicosis, but with no measurable impairment.[25] He understood at the time of that diagnosis that silicosis was associated with rock dust inhalation. In 2008, he filed for additional benefits based on progressive shortness of breath and was notified in 2009 that there was "sufficient evidence to justify a diagnosis of occupational pneumoconiosis" without additional impairment. Sometime in that same time frame, 2009 to 2010, Mr. Manuel became a certified dust examiner and received training relative to dust exposure and black lung.

On June 4, 2018, Mr. Manuel applied for federal black lung benefits, listing "short of breath" as the disabling condition he believed he had due to black lung or other respiratory or pulmonary disease. During a November 2018 deposition, given as part of the benefits application process, Mr. Manuel testified that he was evaluated by Dr. Forehand. Medical records indicate that he was evaluated on June 10, 2018, and was diagnosed at that time with complicated coal workers' pneumoconiosis with progressive massive fibrosis.

---

[25] Prior to 2003 amendments, West Virginia's workers' compensation system provided five percent permanent partial disability awards for miners who had x-ray evidence of black lung disease regardless of measurable impairment.

Mr. Manuel's testimony in his deposition for his underlying case discussed how that diagnosis was conveyed to him during his visit with Dr. Forehand:

> Q.  In this report [Dr. Forehand] talks about your chest x-ray, and it says, "Complicated coal workers' pneumoconiosis." Do you recall him telling you that?
>
> A.  I thought it was fibromyosis (verbatim). I don't –
>
> Q.  Do you recall Dr. Forehand telling you – you were sick?
>
> A.  He said my lungs were pretty bad.
>
> Q.  Okay. And he told you that after he examined you?
>
> A.  Yeah. Yeah, he's the one that told me I needed to be a Part 90 miner. That's how I got to be a Part 90 miner.[26]
>
> Q.  So in July of 2018, you think Dr. Forehand told you you should be a Part 90 miner?
>
> A.  Yeah, that's when he told me.

(Footnote added).


On February 1, 2019, a federal claims examiner issued an order finding that Mr. Manuel's black lung "caused a breathing impairment of sufficient degree to establish total disability." Mr. Manuel's brief asserts that his employer requested a hearing to challenge the findings, after which Mr. Manuel's counsel in the underlying case filed a notice of appearance. Mr. Manuel's employer ultimately withdrew its request for a hearing

---

[26] A "Part 90" miner refers to a federal law classification for a miner who has evidence of pneumoconiosis, and, pursuant to 30 C.F.R. Part 90, has a right to work in a less dusty part of the mine.

and the order awarding benefits became final on October 5, 2020. Mr. Manuel asserts that date was the first time he learned that he suffered from complicated black lung or any impairment due to black lung, and that it was not until he met with counsel on May 21, 2021, that he learned of the possible causal connection between his injury and the respirators.

Mr. Manuel claims that there is a disputed question of fact as to when he knew he suffered from impairment due to black lung because he did not recall being notified of a black lung diagnosis earlier than October 2020, at which point "the factual dispute was resolved as to the cause and nature of his lung disease," and his last coal mine employer agreed he did have black lung. As previously stated, affirmative determination of injury, cause, or resulting benefits in an administrative proceeding is not necessary before an injury can be said to have occurred for purposes of the statute of limitations in a civil action. Mr. Manuel clearly understood during his visit with Dr. Forehand in July of 2018 that he had some lung injury associated with dust exposure. Although he suggested he recalled the specific diagnosis differently, Mr. Manuel specifically recalled that he was informed his lungs were "pretty bad," and that Dr. Forehand suggested he seek Part 90 miner status, aimed at reducing dust exposure for those with evidence of development of pneumoconiosis.

Further, in February of 2019, still more than two years before he filed the underlying action, Mr. Manuel was served with a copy of the proposed order where an

administrative body, based on Dr. Forehand's evaluation, informed Mr. Manuel that it had determined he had pneumoconiosis resulting in total disability. Mr. Manuel's contention that he was wholly ignorant of a pneumoconiosis diagnosis until October 2020 is simply untenable. Giving Mr. Manuel the benefit of the doubt that he did not receive or understand the diagnosis rendered by Dr. Forehand in July 2018, he had indisputable knowledge of the diagnosis by February 2019 and yet did not file his claim until August 2021.[27]

Taking the facts in the light most favorable to Mr. Manuel, we likewise conclude that he knew or should have known of the possibility of a causal connection between his lung injury and his respirator more than two years before he filed suit. To his argument that he did not appreciate a causal connection between black lung and his respirators until he first met with counsel in May 2021, we first observe that his counsel represented him as of May 2019. Second, we have already concluded that plaintiffs are charged with factual and not legal knowledge of a cause of action. Similar to Mr. Hardy, Mr. Manuel knew, since early in his career, of the association between lung diseases, and specifically black lung, to inhalation of dust. When deposed, Mr. Manuel testified that he specifically wore his respirator to prevent it. Based on those circumstances, once a physician diagnosed Mr. Manuel with a dust-related lung injury, he knew or reasonably should have known of a possible causal connection between his respirator and his injury

---

[27] We do not mean here to imply that any of Mr. Manuel's prior claims in 2000 or 2008 are necessarily insufficient to trigger knowledge of an injury.

and had an affirmative duty to investigate the respirators as a potential cause. We conclude that Mr. Manuel had all of the relevant knowledge of his injury, a possible causal connection to the respirators, and the identity of the manufacturers more than two years before filing suit.

### iv. Edgel Dudleson

Mr. Dudleson filed his complaint on August 19, 2021; we thus consider whether he knew or should have known of his injuries and their possible cause more than two years prior to that date. Mr. Dudleson worked as a miner from 1976 to 1999, during which time he wore MSA respirators from approximately 1976 to 1986 and 1990 to 1996, and AO-C respirators from around 1990 to 1999. He testified that when he first started mining, he attended courses where he learned that wearing respirators was supposed to protect a miner from breathing in harmful dust and later that he "assume[d] that's the only reason you would wear them." Mr. Dudleson testified that sometime between 1996 and 2000 he knew he had developed a lung disease from his work in the coal mines but differentiated between rock dust injuries and coal dust injuries. In January 2001 he was awarded a five percent workers' compensation permanent partial disability award based on occupational pneumoconiosis with no measurable impairment. By order dated January 16, 2003, that award was later increased to ten percent after Mr. Dudleson appealed and produced the findings of Dr. Rasmussen, who found that Mr. Dudleson suffered ten percent impairment from occupational pneumoconiosis.

Mr. Dudleson later filed a federal black lung claim on June 12, 2018, listing shortness of breath as his debilitating condition. Mr. Dudleson had scans on November 18, 2018, that supported a finding of complicated pneumoconiosis.[28] Despite those findings, his claim was denied on March 27, 2019. Mr. Dudleson filed a motion to modify the decision based on a mistake of fact, citing additional scans taken on June 14, 2019, which also showed complicated pneumoconiosis. The matter was ultimately resolved in Mr. Dudleson's favor by order dated June 10, 2020. Mr. Dudleson's brief asserts that his claim was denied because he did not suffer from totally disabling pneumoconiosis, arguing that he was given conflicting opinions as to whether he suffered from the disease. As a result, he argues that he did not appreciate an injury until his total disability from pneumoconiosis was confirmed by the June 10, 2020 order.

We find that Mr. Dudleson was on notice that he had a lung injury associated with dust exposure in 2003 when he was diagnosed with occupational pneumoconiosis, if not earlier. But even setting that date aside, Mr. Dudleson testified that his "scans" taken during the black lung proceedings showed that he had complicated pneumoconiosis and that this diagnosis was communicated to him by the clinic both by letter. Those scans can only refer to the two scans taken in November 2018 or June 2019—either of which would

---

[28] The record reflects that this scan was read by the radiologist on November 30, 2018.

place Mr. Dudleson's claims outside the statute of limitations.[29] Mr. Dudleson's contention that he did not know or have reason to know of his lung disease until June 10, 2020, when the diagnosis was communicated to him through the *order* awarding him benefits lacks foundation in the record.

For the same reasons set forth above, we also reject that Mr. Dudleson could not have made a causal connection until he met with his attorney in 2021 when he was apparently advised that he might have a products liability claim against AO-C and MSA when he was aware of all requisite facts to recognize a possible causal connection well prior to that meeting. Mr. Dudleson likewise testified that, while he was working as a miner, he knew dust inhalation caused lung damage, and that he was wearing a respirator for the specific purpose of avoiding dust-based lung diseases. Once Mr. Dudleson sustained a dust-based injury, he had a duty, as any reasonable plaintiff does, to investigate the respirator's potential inefficacy as a possible cause of the injury, and he did no such investigation. We thus conclude that more than two years before he filed suit, Mr. Dudleson both knew of his

---

[29] The circuit court and ICA attributed a date of diagnosis as June 14, 2019—the date the later CT scan was taken—as triggering the injury. While we disagree with the assignment of that particular date, insofar as his doctor did not read the CT until July 29, 2019, we do observe that Mr. Dudleson's counsel—the same counsel representing him in this proceeding—argued in his request for a modification to the decision denying federal black lung benefits that the doctor's reading of the June 14, 2019 scan "is plainly and unequivocally a diagnosis of complicated pneumoconiosis by a qualified radiologist" and requested backpay dated to June 14, 2019. Under such facts no reasonable juror could conclude that Mr. Dudleson was not on notice of an injury more than two years before he filed his claim.

injury and knew or reasonably should have known of its possible causal connection to respirators.

### v. Ricky Miller

Petitioner Ricky Miller filed his complaint on August 19, 2021. Mr. Miller was a coal miner from 1970 until 1982, during which time he used respirators manufactured by 3M. He gave conflicting testimony that he wore his respirator at all times and only those times when in dusty parts of the mine. Mr. Miller was awarded state workers' compensation benefits by order dated October 24, 2013, for pneumoconiosis with a 20 percent impairment, for which he first received payment in December 2013. Mr. Miller testified that he was surprised to get the diagnosis because he wore a respirator and that he thought about contacting "somebody" because he felt the respirators should have protected him but did not:

> Q. When you were diagnosed the first time in 2013, did you wonder whether or not the respirators worked?
>
> A. I was surprised.
>
> Q. Why were you surprised?
>
> A. When I found out I had Black Lung that, how did it [sic] get it.
>
> Q. Were you surprised because you wore a respirator--
>
> A. Yeah
>
> Q. –a hundred percent of the time?
>
> A. Yeah.

Q. And did you think that maybe the respirators didn't protect you?

A. I didn't think so; didn't think it helped at all since I got the Black Lung.

* * * *

Q. Okay. Did you contact 3M in 2013 to see if they had tested the respirators?

A. No.

Q. Why not?

A. I just didn't.

Q. But did you think about contacting them?

A. I thought about talking to somebody about it.

Q. Because you felt like they should have protected you?

A. Yes.

Mr. Miller's disability award was later increased to twenty-five percent in March of 2017, and he applied for federal black lung benefits on December 18, 2017. Still, he contends that he did not become aware that he suffered from complicated black lung until September 2019, when he *received* his federal black lung benefits, and thus that the statute of limitations was not triggered until that date. We disagree that such a conclusion is reasonably supportable by the evidence such that a jury could reasonably conclude Mr. Miller was unaware of his injury until that later date.

Mr. Miller objectively knew or should have known in late 2013 that he

47

suffered an injury because he was receiving benefits for his pneumoconiosis diagnosis and 20 percent impairment and was informed by letter of the basis of that award. He further testified that as of 2013, he understood that disease to be causally related to respirator use and that he wore his respirator to prevent that specific type of injury, even testifying that he thought about contacting someone because the respirators had not protected him. Despite his understanding and actions, he testified that he had conducted no investigation and did not file his suit until he heard others were filing them. Because Mr. Miller, too, was aware of all requisite facts to bring his cause of action against 3M more than two years before filing his complaint, it was untimely.

### vi.    James Cruey

Petitioner James Cruey filed his complaint on September 3, 2021. Mr. Cruey worked as a coal miner from 1968 to 1999, during which time he wore MSA respirators, and wore 3M respirators in the 1990s, though he did not always wear respirators when exposed to dust. He began experiencing shortness of breath, at which point he applied for state workers' compensation benefits and was later awarded twenty-five percent impairment based on a silicosis diagnosis in 1985. He testified that he was aware that the rock and coal dust was bad for his lungs, and that the respirators were "catching some of it, but not all of it."

Mr. Cruey later applied for federal black lung benefits in 2004. Those benefits were denied by letter dated May of 2005 because he was not totally disabled by

48

regulatory standards—not because he did not have pneumoconiosis. However, he was later denied federal black lung benefits in 2013 for lack of pneumoconiosis findings, which exams were performed by different physicians. He filed for federal black lung benefits again in 2016 and was evaluated by Dr. Forehand. Mr. Cruey testified that Dr. Forehand, in 2016, was the first to tell him he had black lung, but that after that date he received other diagnoses from other doctors who told him he did not have it. The proposed order issued by the federal claims examiner on April 20, 2018 determined that Mr. Cruey had total disability caused by black lung and awarded him benefits. However, Mr. Cruey's employer requested a formal hearing. At that hearing on June 6, 2019, Mr. Cruey testified that he knew his lungs were injured. The matter remained in contest until he was awarded benefits in September 2020. Upon hearing that others were filing lawsuits, Mr. Cruey filed the underlying suit in September 2021.

Mr. Cruey contends that his claim was not triggered until he was awarded federal black lung benefits in September 2020, because, until that point, he remained unsure whether he had black lung. Without belaboring the point, Mr. Cruey's case perhaps best demonstrates why administrative proceedings, here claims for federal black lung benefits, are not indicative of when an injury has occurred in tort. Mr. Cruey's asserted equivocation surrounding whether he was injured centers on his confusion because he (1) was previously denied benefits and (2) received conflicting reports when his employer contested the decision to award him benefits. But Mr. Cruey's benefits were not denied in 2005 for lack of an injury, they were denied because his pulmonary impairment did not

49

meet regulatory standards to establish total disability. He was on notice of an injury both when he received the denial letter indicating that evidence suggested he had pneumoconiosis in January 2005 and, at the latest, when Dr. Forehand diagnosed him with it in 2016.

As discussed above, Mr. Cruey's subjective thought process that he must not have black lung because his federal black lung benefits were denied or because doctors were contesting it during those administrative proceedings is not relevant in an objective analysis as to when a plaintiff knows or reasonably should know he has suffered a lung injury such that he is on notice to investigate possible causes. Such an analysis places a court in the untenable position of applying the discovery rule to save a claim on the basis that a plaintiff was completely unaware that he was injured despite his zealous advocacy in another forum that he definitively was.

To causation, Mr. Cruey testified that he wore his respirator to protect him from dust exposure, which he knew caused black lung, and that he just never thought to investigate the respirators. For similar reasons as those Petitioners above, Mr. Cruey had knowledge of all requisite facts and a duty to investigate and discover his cause of action, yet failed to do so within the timeframe allowed by the applicable statute of limitations.

**vii.    Mark Scott**

Petitioner Mark Scott filed his complaint on September 9, 2021. He worked

as a coal miner from 1980 to 2017, and wore respirators manufactured by MSA from around 1990 to 1994. He testified, however, that he stopped wearing respirators when he was reassigned from the bolt machine to running a tractor. In 1998, he applied for workers' compensation benefits and was awarded ten percent impairment for silicosis. Mr. Scott testified that he stopped working altogether in 2017 due to his lung issues and filed a federal black lung benefit application on December 20, 2017, stating as the basis of his application that he had become disabled and was unable to breathe due to his lung disease. Dr. Green evaluated Mr. Scott in that process and diagnosed him on April 19, 2018, with findings consistent with coal workers' pneumoconiosis with progressive massive fibrosis, resulting in total disability. The federal claims examiner issued a proposed decision on November 28, 2018, concluding that Mr. Scott did suffer from black lung, but recommended denying benefits on the basis that he lacked sufficient impairment to constitute total disability. Mr. Scott contested the proposed decision on December 28, 2018, writing that the doctors who "found against him" were doctors who worked for the company and asserting that other doctors, who did not, found that he had complicated black lung. After obtaining counsel, who also represents Mr. Scott in the underlying proceedings, Mr. Scott submitted evidence in his federal black lung claim asserting that he conclusively suffered from complicated black lung as demonstrated by scans taken in April of 2018 and read on January 1, 2019. Still, Mr. Scott maintains that he did not know conclusively that he suffered from complicated pneumoconiosis until the date he was awarded federal black lung benefits in December of 2019.

51

But, again, West Virginia law does not require conclusive knowledge; it requires that a plaintiff be on notice that he has an injury. *See* Syl. Pt. 1, *Hickman*, 178 W. Va. 249, 358 S.E.2d 810. Even if we accept that Mr. Scott's ten percent silicosis impairment award was insufficient to trigger appreciation of a dust-based injury, Mr. Scott testified that he stopped working altogether in 2017 due to his lung issues. We noted above that applying for federal black lung benefits does not necessarily equate to knowledge of an injury, and that the fact of application alone is insufficient to trigger that knowledge in *all* cases as a bright-line rule, where, for instance, there might be a plaintiff who applies without any objective injury. Here, however, Mr. Scott applied for federal black lung benefits after his lung issues became so pronounced that he could not continue employment. He certified on his application, on penalty of perjury, that he had left his mining employment because he "became disabled [and] unable to breathe (lung disease)," and in describing his disability he stated that he had "small opacities, coal dust particles causing chronic obstructive pulmonary disease . . . shortness of breath, dizziness, causing light headed [sic]. On oxygen on a [r]egular basis." To the extent that certification, as described by Mr. Scott himself, does not show actual, subjective knowledge of an injury triggering a duty to investigate, the confirming diagnoses he received during the course of his black lung proceedings represent the *latest* possible dates his injury can be said to have accrued, and were communicated to him more than two years before he filed his claim.

Like other Petitioners, Mr. Scott also contends that he was not aware of a causal connection between the respirator and his lung disease, until he met with an attorney,

52

and we reject that contention for the same reasons set forth above. Also similar to other Petitioners, Mr. Scott testified that he knew that inhalation of dust caused lung diseases, and that he understood that the respirator was supposed to block out all of the harmful dust. Nevertheless, Mr. Scott conducted no investigation to discover his cause of action by exploring the potential inefficacy of the device he acknowledges was intended to prevent his injury. We thus conclude that Mr. Scott objectively knew or reasonably should have known of the factual basis of his injury and its possible cause more than two years before he filed his complaint, and that no reasonable juror could find otherwise.

### viii.  Gary Scott

Petitioner Scott filed his complaint on September 9, 2021. He worked as a coal miner from 1975 until he retired in 2020. He wore respirators manufactured by Respondents 3M, MSA, and AO-C from 1975 to around 1981 or 1982 with limited usage after those dates because he changed jobs within the mine. He was awarded state benefits back in 1994 for five percent *de minimis* impairment, which he testified was when he first received his black lung diagnosis, but his understanding was that it was based on the length of time he spent in the mines, it was not until that award was later increased to ten percent in 1998 that he knew he "had something":

> Q. So you received – I take it your black lung – do you know who diagnosed you with black lung in 1998?
>
> A. Tug River. I went there and got another x-ray, and they sent it to Charleston.

Q. And someone told you that your black lung had gotten worse?

A. Well, the first time I was awarded black lung, it specifically said on the paper I was awarded 5 percent because of my length of time in the coal mines. Then in '98 is when I really got – in my opinion got something because they told me I had something not until '98.

Mr. Scott testified that he was aware when he first went into the mines of the hazards of coal dust, that he wore a respirator to prevent him from breathing in the coal dust, and that he was surprised when he found out he had black lung because he had done everything he could to try to prevent it, specifically wearing his respirator and staying out of the dust. He further testified that he did not think the respirators worked like they said they would but did not do any type of investigation.

Much later, in January of 2018, Mr. Scott received a letter from NIOSH that informed him that his "lungs have been damaged by dust" and that he had evidence of "Category A complicated pneumoconiosis" based on his chest radiographs taken on October 19, 2017.[30] That letter further instructed Mr. Scott to set an appointment with his doctor as soon as possible for confirmatory testing. That same day, the Mine Safety and Health Administration ("MSHA") informed Mr. Scott, via letter, that he had enough evidence of black lung to be eligible for the option to work in a low dust area, i.e., become

---

[30] As explained by the Fourth Circuit in *Adams*, NIOSH administers a program that gives free x-rays to coal miners to promote early detection of mining-related illnesses. 979 F.3d at 252. NIOSH-certified B-readers examine the x-rays for abnormalities and send notice to those miners who have markers of injuries related to dust exposure to obtain additional testing. *Id.*

a Part 90 miner. It further advised him,

> [t]his notification of radiograph evidence of pneumoconiosis may affect your right to, or eligibility for, compensation for work-related illness; or the time limits for filing for such compensation. It is recommended that you consult with a knowledgeable professional, such as an attorney or a physician who is qualified to advise you.

NIOSH's letter expressly stated that it was "a serious warning about [his] lung health." It further put him on notice that he had an injury to his lungs related to dust inhalation: "there is no cure for the damage that the dust has already done to your lungs . . . you already have severe lung damage from coal mine dust." Though the letter also recommended that Mr. Scott see a physician to obtain confirmatory testing and to seek advice of counsel, Mr. Scott conducted no investigation to discover his cause of action at that time.

Mr. Scott filed for federal black lung benefits two years after receiving his NIOSH and MSHA letters, in January of 2020. He retired from mining in April 2020. He was awarded federal black lung benefits on July 12, 2021, and met with counsel on July 19, 2021, eventually filing the underlying suit in September of 2021. Mr. Scott argues on appeal that a reasonable jury could have concluded that either July 12 or 19, 2021 was the date the statute of limitations began to run on his products liability claim. Again, however, we find that on the facts relating to Mr. Scott, it is not reasonable to conclude that he neither knew nor reasonably should have known of his injury or of its possible causal relation to

respirator use until July 2021.

Mr. Scott knew he had suffered black lung causing impairment in 1998 and, in January 2018, received the NIOSH and MSHA letters both of which informed him that he had markers for black lung, that it was a serious lung injury, and that it was caused by dust inhalation. Mr. Scott had an affirmative duty to investigate possible sources of his dust-related illnesses, which would have certainly included the integrity of the respirator he used specifically to prevent him from contracting a dust-based disease. Mr. Scott's claim is likewise untimely as he knew or, by the exercise of reasonable diligence should have known, of all facts giving rise to his cause of action more than two years before he filed his complaint.

We thus conclude that while all seven Petitioners are entitled to use of the discovery rule based on their latent injuries, even its tolling mechanisms are insufficient to save their claims from summary judgment. Their latent injuries manifested and they knew or, by the exercise of reasonable diligence should have known, of a possible causal relationship between their respirators and their dust-based injuries more than two years prior to the filing of their complaints and there is no genuine dispute of fact on those points that creates a trialworthy issue.

**D.** *There is No Evidence of Fraudulent Concealment*

Having determined that Petitioners claims were not timely, even in view of

the discovery rule's tolling mechanism, we return to the larger *Dunn* analysis. As set forth

above, *Dunn*'s fourth factor incorporates a separate tolling mechanism, apart from the

discovery rule, for plaintiffs who were prevented from discovering their cause of action

due to a defendant's fraudulent concealment:

> [I]f the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled.

Syl. Pt. 5, in part, 225 W. Va. 53, 689 S.E.2d 265. Importantly, the burden of production is

on the plaintiff to show an entitlement to tolling based on fraudulent concealment. *Id.*

Petitioners claim that they are entitled to this tolling doctrine because Respondents

fraudulently concealed facts related to their claims. To meet their required showing under

*Dunn*, Petitioners submit that (1) MSA concealed a 1951 report[31] and a 1991 white paper

purporting to demonstrate that its respirators were defective,[32] and its advertising and

marketing materials never suggested that the respirators were ineffective; (2) 3M

advertised that its respirators were effective and able to stop pneumoconiosis and fibrosis-

producing dusts from reaching the lungs despite internal memoranda suggesting otherwise;

and (3) AO-C also advertised its respirators as dependable protection despite knowing

---

[31] MSA contends that no Petitioner even alleges they wore the mask at issue in this report.

[32] MSA clarifies that its corporate representatives testified about the white paper publicly.

57

"long ago" of their deficiencies and concealed its knowledge of the unsuitability of its respirators in coal mines.

Petitioners assert that they had no way of knowing that Respondents had already determined that the respirators were ineffective and unsuitable for their intended purpose, and that the circuit court and the ICA had surprisingly "blamed" them for failing to discover that the respirators were defective by concluding that they were not entitled to tolling under the fraudulent concealment doctrine. Petitioners further contend that the concealment remains *ongoing* because Respondents do not admit that their products were defective and continue to defend that position in the underlying litigation.

Petitioners misunderstand *Dunn*'s standard: the fraudulent concealment factor is not concealment of the *defect* itself. By its explicit terms, *Dunn* equitably tolls the statute of limitations where a defendant's fraudulent concealment is of evidence that prevented the plaintiff from discovering or pursuing a cause of action. Petitioners' cited acts of fraudulent concealment were all matters disclosed in discovery relative to the products' defectiveness, not issues that delayed filing of their actions. In this way, Petitioners conflate fraudulent concealment of a cause of action with nondisclosure that the products were defective. We recognized in *Hickman*, when rejecting the very position Petitioners advance here, that a plaintiff need not have knowledge of a product's defectiveness or the negligent conduct of a manufacturer/distributor before his or her claim accrues. 178 W. Va. at 253, 358 S.E.2d at 814. There, the Court extended the discovery rule

58

to products liability actions, finding that the claim accrues when there is knowledge of an injury, the manufacturer of the product, and a causal connection between the injury and the *product*, but refused to extend it so far as to knowledge of a product's defect:

> Hickman asks us to take this one step further. He suggests that we add another requirement, *i.e.,* that the product was defective as a result of the conduct of its manufacturer. Indeed, this is a big requirement, because such knowledge is often not known with legal certainty until after the jury returns its verdict. At the very least, this knowledge would be very difficult to obtain, except during the discovery phase of trial. Thus, we would have a situation where the statute of limitations would almost never accrue until after the suit was filed. This would almost abrogate the statute of limitations in products liability claims. We cannot accept such a holding.

*Id.* Petitioners have produced no evidence that any Respondent interfered with their ability to investigate their claims to discover their causes of action. Rather, as discussed above in relation to each individual Petitioner, Petitioners did not conduct any investigation at all into their claims. We thus find no evidence of fraudulent concealment so as to toll Petitioners' claims under *Dunn*.

Having analyzed all relevant *Dunn* factors and concluded that, under the facts of these specific cases, there was no genuine issue for trial, we affirm the entry of summary judgment for the reasons set forth above.

## IV.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the Intermediate Court

of Appeals affirming the circuit court's entry of summary judgment in favor of Respondents as modified by this Opinion.

Affirmed.